AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) |
|---|---|
| v. | ) |
| LEON ROACHE and JEAN ADAMES, | ) Case No. 20mj6477-PMH |
| Defendant(s) | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **September 28, 2020** in the county of **Broward** in the **Southern** District of **Florida**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 846 and 841(b)(1)(A). | Conspiracy to Possess with Intent to Distribute 5 Kilograms or more of Cocaine |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

_____
Complainant's signature

SPECIAL AGENT SHAWN STONE, HSI
Printed name and title

Sworn and subscribed telephonically

Date: 09/29/2020

_____
Judge's signature

City and state: Fort Lauderdale, Florida

PATRICK M. HUNT, U.S. MAGISTRATE JUDGE
Printed name and title

# AFFIDAVIT

I, Shawn Stone, being duly sworn, depose and state as follows:

1. I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI"), and have served in this capacity since March 2009. I am assigned to the Homeland Security Investigations, Fort Lauderdale Office in Broward County, Florida. As a Special Agent, I am responsible for investigating violations of federal law related to immigration and customs enforcement. In my current assignment, I am also responsible for investigations involving the importation and distribution of controlled substances, the possession and concealment of such controlled substances, and the laundering of proceeds earned from narcotics trafficking. I have received specialized training in narcotics related and money laundering investigations. I have been involved in the execution and planning of narcotics-related arrests as well as methods used to finance drug transactions and launder drug proceeds for over seventeen (17) years, including in my current position with HSI for the last eleven (11) years.

2. The information contained in this Affidavit is submitted for the limited purpose of supplying probable cause to believe that from in or about April 2019, through on or about September 17, 2020, LEON ROACHE and JEAN ADAMES, did knowingly and willfully combine, conspire, confederate, and agree with each other and with others known and unknown, to import into the United States, from a place outside thereof, 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(A); all in violation of Title 21, United States Code, Section 846. Because of its limited purpose, this Affidavit does not contain all the information known to law enforcement regarding this investigation. This Affidavit is based on personal knowledge as well as information provided to me by other law enforcement officers.

1

3. In or about April 2019, law enforcement received information from a confidential source regarding a drug trafficking organization ("DTO") that was looking to send controlled substances on containerized cargo arriving by ship at Port Everglades, Florida ("PEV"), in the Southern District of Florida. The confidential source provided the DTO with a phone number for an undercover law enforcement officer ("UCA") posing as a corrupt PEV worker. The UCA established communications with the DTO, through an unknown Hispanic male (UHM1) and explained that he could retrieve narcotics from cargo containers and deliver as directed by the DTO. The UCA continued to communicate with the DTO sporadically.

4. In or about February 2020, the UCA engaged in communications with UHM1 regarding a "test load" of cocaine that would be concealed in a cargo container on a cargo vessel headed for PEV. The UCA was provided with the name of the vessel and number of the specific cargo container that would contain the concealed cocaine. On February 26, 2020, consistent with the information provided to the UCA, approximately one-half kilogram of cocaine was seized from the vessel at PEV. Thereafter, the UCA reported to UHM1 that the test load had been successfully removed from the vessel, and the UCA was going to sell the cocaine and provide $5,000 in proceeds to the DTO. UHM1 advised that he would provide the UCA with a contact in South Florida who would accept the money.

5. On or about March 3, 2020, UHM1 sent a WhatsApp message to the UCA with a phone number and the name of the individual picking the money. The UCA called the number and set up an in-person meeting at a restaurant in Plantation, Florida, to provide the $5,000 from the purported sale of one-half kilogram of cocaine.

6. On or about March 4, 2020, at approximately 7:50 p.m., the UCA was sitting at a table outside the restaurant and was equipped with a recording device. At that time, officers

2

observed a Hispanic male, TARGET 1, arrive at the restaurant in a black vehicle. TARGET 1 exited the vehicle and approached the UCA. During the meeting, the UCA handed TARGET 1 an envelope containing $5,000 in cash and asked TARGET 1 to count the money. TARGET 1 said he did not want to count the money in public but asked the UCA how much money was in the envelope. The UCA said "five." TARGET 1 said he was told it would be "nine" and reached for his cellphone. TARGET 1 attempted a telephone call but could not get through. TARGET 1 reiterated that he was told it would be "nine." The UCA told TARGET 1 that the DTO wanted it to be $9,000, but that the UCA was only able to get him the $5,000.

7. Thereafter, TARGET 1 was able to place a call and told the person who answered his call that the UCA had only "five." TARGET 1 handed the phone to the UCA, and the UCA began speaking to an unknown Hispanic male ("UHM2"). The UCA told the UHM2 that after paying off people, the UCA had been left with only $5,000. The call suddenly dropped, and TARGET 1 said he would give the UCA's phone number to the UHM2 so they could speak later and clear things up. TARGET 1 kept the $5,000 and left the restaurant.

8. On or about July 15, 2020, in a recorded meeting, the UCA met with TARGET 1 in Sunrise, Florida. When TARGET 1 arrived at the meeting location, the UCA entered TARGET 1's vehicle. The UCA reminded TARGET 1 again that he had been working with UHM1 and had received cocaine from Colombia through PEV, but several planned shipments had not gone through, and communications had stopped. TARGET 1 said the DTO no longer wanted to work with UHM1. TARGET 1 asked if the UCA was still willing to assist the DTO in receiving cocaine as before. TARGET 1 said the DTO was willing to work with the UCA and asked the UCA to step out of the vehicle while he called the DTO. A short time later, TARGET 1 directed the UCA to return to the vehicle and told the UCA to download the Signal application in order for the DTO

3

to communicate with him, after which the meeting concluded.

9. On or about July 16, 2020, the UCA began receiving messages over the Signal app from another unknown Hispanic male ("UHM3") as well as from TARGET 1.

10. On or about July 19, 2020, the UCA received a call from TARGET 1 stating that the DTO had attempted to contact the UCA the previous day and was worried because they couldn't reach him. The UCA explained he/she didn't carry his/her work phone all the time, and that he/she was communicating with UHM2 over Signal. TARGET 1 instructed the UCA to continue talking to UHM3.

11. On or about August 17, 2020, UHM2 sent the UCA messages containing information regarding a specific cargo container aboard a specific vessel that was scheduled to arrive at PEV. On or about August 19, 2020, law enforcement seized approximately 1.3 kilograms of cocaine from the specific cargo container aboard the specific vessel matching the information provided to the UCA. Thereafter, the UCA reported to UHM3 that the cocaine had been successfully removed from the vessel.

12. On or about September 1, 2020, UHM2 sent the UCA messages containing information regarding a specific cargo container aboard a specific vessel that was scheduled to arrive at PEV. On or about September 2, 2020, law enforcement seized approximately 2.1 kilograms of cocaine from the specific cargo container aboard the specific vessel matching the information provided to the UCA. Thereafter, the UCA reported to UHM2 that the cocaine had been successfully removed from the vessel.

13. Later on, September 2, 2020, in a recorded meeting, the UCA met with TARGET 1 in Sunrise, Florida. During the meeting, TARGET 1 proposed that the UCA be paid for the total amount of 10 kilograms that were ultimately expected to be shipped, if the UCA would deliver the

cocaine that had already been shipped. The UCA said he was not willing to risk his "operation" just to deliver a smaller amount of cocaine. TARGET 1 agreed and said he would talk to the DTO about the situation.

14. On or about September 8, 2020, UHM3 sent the UCA messages containing information regarding a specific cargo container aboard a specific vessel that was scheduled to arrive at PEV. On or about September 9, 2020, law enforcement seized approximately 1.3 kilograms of cocaine from the specific cargo container aboard the specific vessel matching the information provided to the U.C. Thereafter, the UCA reported to UHM2 that the cocaine had been successfully removed from the vessel.

15. On or about September 14, 2020, UHM2 sent the UCA messages containing information regarding a specific container aboard a specific vessel that was scheduled to arrive at PEV. UHM3 further informed the UCA that this shipment would consist of 21 kilograms of cocaine. On or about the morning of September 16, 2020, law enforcement seized approximately 21 kilograms of cocaine from the specific cargo container aboard the specific vessel matching the information provided to the UCA. Thereafter, the UCA reported to UHM2 that the cocaine had been successfully removed from the vessel.

16. On or about September 21, 2020, UHM2 sent the UCA messages containing information regarding a specific container aboard a specific vessel that was scheduled to arrive at PEV. UHM2 further informed the UCA that this shipment would consist of approximately 40 bricks of cocaine.

17. On or about the morning of September 23, 2020, law enforcement seized 40 bricks of cocaine weighing approximately 47 kilograms from the specific cargo container aboard the specific vessel matching the information provided to the UCA. Thereafter, the UCA reported to

5

UHM2 that the cocaine had been successfully removed from the vessel.

18. After September 23, 2020, the UCA communicated several times with UHM2 and TARGET 1 regarding the delivery of the cocaine that had been imported to PEV, and the payment due to the UCA for his assistance. Eventually, the UCA agreed to deliver 25.5 kilograms out of the total amount of imported cocaine in return for a payment of approximately $71,400. The UCA and TARGET 1 agreed to meet at a gas station in Broward County in the early evening of September 28, 2020.

19. On or about September 28, 2020, at approximately 4:40 p.m., law enforcement arrived at the gas station and set up surveillance. At approximately 5:39 p.m., TARGET 1 arrived by vehicle. Shortly thereafter, another vehicle, driven by ROACHE, with ADAMES in the front passenger seat, arrived and parked next to TARGET 1's vehicle. All three exited their vehicles and greeted each other. Shortly thereafter, the UCA arrived at the gas station. TARGET 1 approached the UCA's vehicle carrying a white plastic bag and placed it inside the UCA's vehicle. The UCA asked TARGET 1 if ROACHE and ADAMES were with him and could be trusted, and TARGET 1 confirmed they could. The UCA invited TARGET 1 to come into the UCA's vehicle. The UCA reviewed the contents of the bag and confirmed it contained what appeared to be approximately $71,400 in cash.

20. Thereafter, the UCA told TARGET 1 to follow him to pick up the cocaine. TARGET 1 exited the UCA's vehicle and spoke to ROACHE and ADAMES. TARGET 1 reentered his vehicle, and ROACHE and ADAMES reentered their vehicle. Both vehicles followed the UCA to a secure location in Broward County.

21. At the secure location, the UCA brought TARGET 1, ROACHE and ADAMES into an office within the facility that is equipped with video recording. The UCA proceeded to

count the money in front of TARGET 1, ROACHE and ADAMES. While UCA was counting the money, TARGET 1, ROACHE and ADAMES discussed who would be taking which portions of the cocaine. During the discussion, ADAMES mentioned where he was from, and the UCA asked how much a kilogram of cocaine cost in that area, and ADAMES said $54,000. Once the UCA finished counting the money, he exited the room and returned dragging a garbage bag filled with kilograms and half-kilogram bricks of cocaine. The UCA commented that there was a lot of cocaine, and laid the bag on the floor in front of TARGET 1, ROACHE and ADAMES. The UCA started taking out bricks of cocaine and handing them to TARGET 1, who placed them on the floor. The UCA commented about the apparent quality of the cocaine based on the hardness of the bricks.

22. Once the bricks were all laid out, the UCA asked who would be taking which bricks. TARGET 1 said ROACHE would be taking the "halves," referring to half-kilogram packages, and either TARGET 1 or ADAMES said that ADAMES would be taking some of the remaining bricks.

23. TARGET 1 began to separate the "halves" from the remaining bricks. The UCA exited the room, ROACHE opened up the trash bag that formerly contained the cocaine. ADAMES picked up three kilogram bricks and attempted to place them into the garbage bag, at which time law enforcement entered and arrested the occupants.

24. Post-*Miranda*, ADAMES admitted that he had provided $11,400 toward the payment given to the UCA for the release of drugs. Post-*Miranda*, ROACHE admitted that he was going to deliver 2.5 kilograms of the cocaine to an unknown individual.

25. Based on the foregoing facts and information, your Affiant respectfully submits that there is probable cause to believe that from in or about April 2019, through on or about September 17, 2020, LEON ROACHE and JEAN ADAMES did knowingly and willfully

7

combine, conspire, confederate, and agree with each other and with others known and unknown, to import into the United States, from a place outside thereof, 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(A); all in violation of Title 21, United States Code, Section 846.

FURTHER YOUR AFFIANT SAYETH NOT.

_____
SHAWN STONE, SPECIAL AGENT
HOMELAND SECURITY INVESTIGATIONS

Attested to by the applicant by Telephone in accordance
with the requirements of Fed. R. Crim. P. 4.1
this 29TH day of September, 2020

_____
PATRICK M. HUNT
UNITED STATES MAGISTRATE JUDGE

8